IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CENTRAL STATES SOUTHEAST
AND SOUTHWEST AREAS PENSION
FUND; and ARTHUR H. BUNTE,
JR., Trustee,

            **Plaintiffs,**

     **v.**

SCOTT DIZACK, an Individual,

          **Defendant.**

Case No. 16 C 3315

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

This case arises out of efforts by Plaintiff Central States, Southeast and Southwest Areas Pension Fund ("the Fund") to collect withdrawal liability assessments owed to it by non-party Harris Lumber Company ("Harris"), of which Defendant Scott Dizack ("Dizack") is the sole shareholder. Both parties now move for summary judgment on all counts, and Dizack also moves to strike two of the Fund's statements of facts filed in support of its Motions. For the reasons set forth herein, the Court grants in part and denies in part the Fund's Motion and denies in full each of Dizack's Motions.

### I. BACKGROUND

Dizack is a Wisconsinite who began serving as the President and sole shareholder of Harris Lumber Co. in 2004 (if not earlier). (R. 66, Def.'s Resp. to Pl.'s Rule 56.1 Statement ¶¶ 7, 10.) During Harris's years in operation, it was a party to collective bargaining agreements that required it to make certain pension payments to the

Fund. (*Id.* ¶ 11.) Harris Lumber ran into financial troubles, however, and in December 2012 and December 2013 respectively, Harris triggered a partial and then a complete withdrawal from the Fund. (*Id.* ¶¶ 15-16 (citing 29 U.S.C. §§ 1385(a)(1), 1383).) By April 2014, the Fund had sued Harris Lumber to collect on assessments for both withdrawals, and by May the Fund had won judgment in the amount of $1,204,720.30 plus interest. (*Id.* ¶¶ 19-20.) When the Fund could not collect its judgment in full from Harris, it brought this action seeking to recover certain monies from Dizack.

## A. Harris Lumber's Finances

Harris's financial troubles date to at least 2006, when the company ceased to be profitable. (*Id.* ¶ 21.) By 2012, Harris could no longer pay its debts as they became due. (*Id.*) Between 2004 and 2013, Dizack made several cash payments to Harris, and Harris made several return payments to Dizack:

| Date | Paid by Dizack to Harris Lumber | Paid by Harris Lumber to Dizack | Harris's Net Received from Dizack |
|------|------|------|------|
| 4/28/2004 | $200,000 | | $200,000 |
| 8/23/2004 | $75,000 | | $275,000 |
| 8/24/2004 | $75,000 | | $350,000 |
| 8/27/2004 | $125,000 | | $475,000 |
| 10/18/2004 | | $112,000 | $363,000 |
| 4/29/2005 | | $75,000 | $288,000 |
| 5/24/2005 | | $50,000 | $238,000 |
| 12/15/2005 | $150,000 | | $388,000 |
| 12/23/2005 | $100,000 | | $488,000 |
| 1/24/2006 | | $75,000 | $413,000 |
| 4/17/2006 | | $213,000 | $200,000 |
| 8/10/2006 | $225,000 | | $425,000 |
| 12/29/2006 | $150,000 | | $575,000 |
| 1/3/2007 | | $150,000 | $425,000 |
| 9/28/2007 | $60,000 | | $485,000 |
| 10/11/2008 | | $60,000 | $425,000 |

| Date | Paid by Dizack to Harris Lumber | Paid by Harris Lumber to Dizack | Harris's Net Received from Dizack |
|------|------|------|------|
| 1/31/2008 | $187,000 | | $612,000 |
| 7/2/2013 | $30,000 | | $642,000 |
| 10/1/2013 | | $35,000 | $607,000 |
| 12/31/2013 | | $8,425 | $598,575 |

(R. 46-2, Def.'s Rule 56.1 Statement ¶¶ 24-32; R. 65, Def.'s Resp. to Pl.'s Mot. at 3-4.)   The parties dispute whether Harris executed instruments of indebtedness when Dizack made these payments. (R. 46-2 ¶ 23.)   Where instruments undisputedly exist, there are few facts describing their execution or purpose.   In January 2010, Harris executed a promissory note for a $750,000 loan from Dizack to be secured by a security agreement and a UCC financing statement giving Dizack a security interest in Harris Lumber's assets.   (*Id.* ¶ 26.) Dizack recalls executing that security agreement but has not been able to produce it.   (*Id.* ¶ 27.)   In March 2010, counsel for Harris drafted another promissory note and another security agreement, these covering all previous payments Dizack made to Harris.   (*Id.* ¶ 28.)   The March 2010 note stated an outstanding balance owed by Harris to Dizack of $612,000.   (*Id.* ¶ 32.)   Harris has not been able to produce an executed copy of either March 2010 document.   (*Id.* ¶ 28.)   During the years at issue, Harris made interest payments to Dizack from 2004 through mid-2010.   Harris's financial troubles intensified in 2010, and it stopped paying interest.   (*Id.* ¶ 39.)

## B. Dizack's Leasing Business

The scope of Dizack's leasing operations is crucial to Counts IV and V of the Fund's First Amended Complaint. Dizack owns and lives in an apartment in Racine, Wisconsin. (*Id.* ¶¶ 47, 48.) At some point, Dizack expanded his unit into the unit next door. (*Id.* ¶ 49.) This expansion rendered the next door unit too small to sell under his condo association's rules. (R. 67, Def.'s Additional Rule 56 Statement ¶ 23.) Dizack immediately began renting out the adjacent unit (the "Racine Apartment") and it has rarely been without a tenant. (R. 66 ¶ 51.) In 2004, Dizack purchased a condo in Naples, Florida, which he rented from 2006 until 2016 when he sold the property. (*Id.* ¶¶ 52-54, 62.) Prior to that sale, Dizack worked with a real estate agent who handled various administrative and upkeep tasks for the Naples property, including handling tenant recruitment, advertising the condo and handling showings, receiving checks for rent and taxes, ensuring the property was cleaned and supplied, assessing and coordinating repairs and maintenance, and staying in contact with tenants as needed. (*Id.* ¶¶ 56-59.)

## II.  LEGAL STANDARD

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). On cross-motions for summary judgment, the Court construes all facts and inferences "in favor of the party against whom the motion under consideration is made." *In re United Air Lines, Inc.,* 453 F.3d 463, 468 (7th Cir.

2006) (quoting *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 536 (7th Cir. 2005)). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *See, Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

### III. <u>DISCUSSION</u>

The Fund pursues summary judgment on five counts, which can be divided into two groups. Counts I, II, and III turn upon the characterization of payments Dizack made to Harris Lumber from 2004 to 2013. Dizack contends these were loans, and so Harris's return payments were simply repayments of those loans. The Fund argues Dizack's payments were not loans at all, but rather capital contributions and, as such, Dizack was not entitled to repayment. Counts IV and V form the second group. In those counts, the Fund argues Dizack's leasing business and Harris are under Dizack's common control, and thus the business and Dizack himself are joint and severally liable for Harris's withdrawal assessments.

Both parties now move for summary judgment on all counts. In addition to combatting the Fund on the merits, Dizack also argues Counts I-III are barred by the statute of limitations. Finally,

Dizack moves to strike (Rs. 68, 79) two of the Fund's statements of fact for nonconformity with Local Rule 56.1. For the reasons discussed below, the Fund's Motion for Summary Judgment is granted in part and denied in part, and Dizack's Motion for Summary Judgment and Motions to Strike are denied in full.

## A. Loans or Capital Contributions?

This question arises time and time again in this case. The morass boils down to whether the Court should accept Dizack's labeling of his payments as "loans," or whether the Court should instead characterize these as capital contributions which did not entitle Dizack to repayment. In *Roth Steel Tube Co. v. C.I.R.,* 800 F.2d 625, 630 (6th Cir. 1986), the Sixth Circuit set forth eleven factors to assist courts in analyzing the loan v. capital contributions question. Put another way, the *Roth Steel* analysis aims "to determine whether the objective facts establish an intention to create an unconditional obligation to repay the finances." *Id.* The Seventh Circuit has employed a similar set of factors, *Price v. Comm'r of Internal Revenue,* No. 97-2842, 1998 WL 234520, at *2 (7th Cir. May 6, 1998) (citing *Roth Steel,* 800 F.2d at 630), and other courts in this district have applied the *Roth Steel* analysis, *see, e.g., Central States v. TAS Inv. Co. LLC,* No. 11-CV-2991, 2013 WL 1222042, at *18 (N.D. Ill. Mar. 25, 2013); *In re Outboard Marine Corp.,* No. 00 B 37405, 2003 WL 21697357, at *5 (N.D. Ill. July 22, 2003)). Those factors are:

(1)    the names given to the instruments, if any, evidencing
       the indebtedness;

(2)    the presence or absence of a fixed maturity date and
       schedule of payments;

(3)    the presence or absence of a fixed rate of interest
       and interest payments;

(4)    the source of repayments;

(5)    the adequacy or inadequacy of capitalization;

(6)    the identity of interest between the creditor and the
       stockholder;

(7)    the security, if any, for the advances;

(8)    the corporation's ability to obtain financing from
       outside lending institutions;

(9)    the extent to which the advances were subordinated to
       the claims of outside creditors;

(10)   the extent to which the advances were used to acquire
       capital assets; and

(11)   the presence or absence of a sinking fund to provide
       repayments.

*Roth Steel,* 800 F.2d at 630.

Here, the character of the Dizack payments (loan or capital contributions) is a material factual issue. But keeping in mind the parties' respective summary judgment burdens, applying the *Roth Steel* factors to this case does not produce a picture clear enough to rule upon as a matter of law. It does not help that Dizack simply shrugged off the *Roth Steel* analysis, stating incorrectly that addressing the factors would "not serve any purpose." (R. 65 at 6.) To its credit, the Fund argued the factors, but the Court disagrees with some of its conclusions. To the Court's eye, the three factors related

respectively to the payment schedule, the identity between creditor and stockholder, and the subordination of advances weigh most heavily toward capital. The March 2010 promissory note does not set any fixed maturity date or payment schedule for the Dizack "loans" (Harris Lumber 30(b)(6) Dep. Tr., R. 49-18 at 33-34), and Dizack has not pointed to a date or schedule set forth elsewhere. Dizack is the sole shareholder of Harris Lumber, so he is thus Dizack's creditor and shareholder, which "suggests the opportunity to contrive a fictional debt." *Roth Steel,* 800 F.2d at 630 (citations omitted); R. 66 ¶¶ 7, 10. Dizack maintains that he had a security interest in Harris's assets when the company began to liquidate. Yet he also admits Harris used the liquidation proceeds to pay off almost all other creditors (including unsecured ones) before repaying him. (R. 66 ¶ 43.)

Factors 3, 7, and 10, related respectively to interest, security, and the use of the advances to acquire capital assets, weigh somewhat in favor of capital. The March 2010 promissory note sets an interest rate, and Harris undisputedly paid interest from 2004 to mid-2010, but then simply stopped when it could no longer pay. Harris maintains it executed a security agreement for the note. Dizack has not been able to produce any executed copy, and it is undisputed that the unexecuted copy fails to identify any equipment or other assets as security. (R. 66 ¶ 30.) The UCC financing statement Harris drafted does not help Dizack's position, given that such statements "can neither reduce nor enlarge the security interest actually created by the parties [in the security agreement]." *Sierra Fin. Corp. v. Excel Labs., LLC,* 589

N.W.2d 432, 435 n.2 (Wis. Ct. App. 1998) (citing *Allis-Chalmers Corp. v. Staggs,* 453 N.E.2d 145, 149 (Ill. App. Ct. 1983)) (alteration in original).  Finally, it is not clear what, exactly, Harris used the Dizack payments for.  On a general level, Dizack states these monies were used to fund the expansion of the company's operations, which required additional inventory and employees to service the volume.  (R. 66 ¶ 24.)

But the record as to the rest of the factors is either muddled or else, at present, completely opaque.  Harris's capitalization is not in the record for most of the pertinent timeframe, although Dizack admits that Harris ceased to be profitable in 2006 and became unable to pay out on its debts as they became due starting in 2010.  The Fund asserts that "no outside lending institution would loan money to Harris," but that is disputed and unclear from the record:  Dizack testified that in 2004, all of the banks gave "pretty much the same response," *i.e.,* they "wanted nothing to do with anything housing related," given the recent market collapse, and so would not extend financing to Harris.  (Harris Lumber 30(b)(6) Dep. Tr., R. 49-18 at 12:15-13:18; Pl.'s Mem. in Supp. of Mot., R. 48 at 9.)  But Dizack does not testify one way or another as to whether the banks changed their tune any time in the next nine years.  Dizack further contends that he "elected to personally loan money to the business in order to remain efficient and focus on business operations rather than re-negotiate credit limits."  (R. 66 ¶ 25.)  The evidence underlying Factor 11—regarding whether Harris had a sinking fund—suffers from a

similar shortcoming:  Though the Fund contends that Harris never had a sinking fund, the Fund did not produce evidence demonstrating as much. In Harris's 30(b)(6) deposition, the Fund's counsel elicited some testimony on the subject but ultimately failed to pin down Dizack to an answer.

> Q:  Regarding the loans that you made to Harris Lumber Company, did Harris Lumber have any type of sinking fund to repay those loans during any time after 2004?
> A:  What do you mean, sinking fund?
>
> Q:  Any type of special – well, did they have any special provision or – I guess we could even say, like, plan to repay the loans to you, 2004 or after?
> A:  Yeah, the intent was to repay all of them.
>
> Q:  Okay. So it just had the intent but no specific account or financial plan in place to pay – to pay these?
> **A:  I guess I find your question kind of vague, so I don't really know how to answer it.**
>
> Q:  **That's fine. We can move on.**

(Harris Lumber 30(b)(6) Dep. Tr., R. 49-18, 14:7-15:12 (emphasis added).)

The source of repayments is similarly unclear.  This factor turns upon whether Dizack's expectation of repayment depended solely on the success of the business.  *Roth,* 800 F.2d at 631.  If so, the transaction has the appearance of capital contribution.  *Id.*  But again, the record as to Harris's financial health is not clear (at least in the 2004-2010 timeframe).  Perhaps Dizack's repayment expectations became less reasonable as time wore on, given that Harris continued to carry a "loan balance" from 2004 as it entered 2006.  But the Fund has not argued this, Dizack has not illuminated Harris's

financial condition in these years, and the Court will not speculate from this thin record whether Harris was struggling mightily already, or whether Dizack was content to collect interest on the "loans" while enabling his company to grow rather than calling the debt due.

Finally, and on a more general point: Dizack made eleven at-issue payments to Harris from 2004 to 2013. In those same years, Harris paid Dizack nine times. In some instances, Harris appeared to "repay" Dizack quickly (*e.g.,* returning $30,000 in three months in 2013 and $150,000 within a week in 2007). Other Dizack payments appear to have gone un-repaid (*e.g.,* much of an initial $275,000 paid in April and August 2004 and a $225,000 payment in 2006). Clearly the financial health of the company — and Dizack's appreciation of its downturn — changed as the years wore on. But though the Fund mentioned as much in passing (R. 48 at 11), neither party engaged with how these changing conditions might well affect the loan v. capital classification of some of those eleven Dizack payments. Perhaps all Dizack distributions made before 2006 (when Harris ceased being profitable) truly were loans, and Harris collected interest but chose not to call those sums due. Or, perhaps Harris bled money every day from April 2004 onwards, and an insider such as Dizack reasonably should have seen the writing on the wall and known that his only hope of recovering any disbursements would be if the company miraculously turned a profit. *Roth,* 800 F.2d at 631. The reality could be either, or something else. As the record stands, however, the Court cannot determine where, if at all, to draw this line.

Judge Thomas M. Durkin helpfully collected cases facing this same loan v. capital question, and his research divided thusly: Courts generally find such payments to be capital contributions when no loan documents exist and interest is not actually paid, and courts find the converse to be true where a loan is properly documented and interest is paid. *In re SGK Ventures, LLC,* No. 15 C 11224, 2017 WL 2683686, at *6 (N.D. Ill. June 20, 2017) (collecting cases). Our facts fall somewhere in the middle. True, as shown in the *Roth Steel* analysis above, the scales tilt toward capital contributions. But this inquiry is simply too fact-intensive, and the record too disputed, equivocal, and sometimes sparse to warrant summary judgment finding as much.

## B. MPPAA Evade/Avoid Provision (Count I)

Under the Multiemployer Pension Plan Amendments Act of 1980 (the "MPPAA"), if a principal purpose of any transaction is to evade or avoid withdrawal liability, that transaction may be disregarded and liability enforced as if the transaction had not occurred. *See, Chicago Truck Drivers v. El Paso Co.,* 525 F.3d 591, 596, 599 (7th Cir. 2008) (citing 29 U.S.C. § 1392(c)). Thus, a plaintiff may reach those assets transferred to evade or avoid liability. *Central States v. TAS Inv. Co.,* No. 11-CV-2991, 2013 WL 1222042, at *12 (N.D. Ill. Mar. 25, 2013) (citation omitted). Section 1392(c) only requires that *a* principal purpose — not *the* principal purpose — of a transaction be the evasion or avoidance of withdrawal liability. *Id.* at *12 (citing *Santa Fe Pac. Corp. v. Central States*, 22 F.3d 725, 727 (7th Cir. 1994)) (citation omitted).

The Fund argues that evasion was a principal purpose behind each of the transfers from Harris to Dizack made after whatever point (not specified by the Fund) in 2006 that Harris/Dizack first learned of the possible withdrawal liability. The Fund suggests two reasons why this is so. First, the Fund argues that if the Dizack distributions were not really loans, the Harris distributions were not repayments but rather impermissible corporate payouts. (Pl.'s Reply, R. 75 at 7.) Dizack, of course, argues the opposite: He spends five full pages making a single argument — namely, he loaned Harris money and thus Harris cannot be punished for duly repaying that debt. This is the only argument Dizack makes in support of his Motion for Summary Judgment on Count I. However, neither party has established the character of the Dizack distributions as a matter of law, so both arguments fail. (*See,* Part III.A.) Dizack's Motion for Summary Judgment on Count I is denied.

Beyond the loan v. capital debate, the Fund also suggests that the facts speak for themselves: Dizack (and thus Harris) because aware of the withdrawal liability in 2006 (if not earlier); notwithstanding that knowledge, Dizack directed Harris to make its distributions and, when Harris liquidated, to pay all other creditors except the Fund and a disputed lessor. Further, Harris never drew up a note or security agreement for these debts until 2010, some six years after his first disbursement. The Fund points to two cases to bolster its argument. The first is a ruling on a motion to dismiss and is of minimal use here. *See, Bd. of Trustees, Sheet Metal*

*Workers' Nat. Pension Fund v. Illinois Range, Inc.,* 186 F.R.D. 498
(N.D. Ill. 1999), *adopted in part,* 71 F.Supp.2d 864 (N.D. Ill. 1999).
The second case is much more illuminating, but it actually harms the
Fund's argument more than it helps. In *TAS Investment Co.,* the court
granted summary judgment (in part) on the Fund's Section 1392(c)
evade/avoid argument. *TAS Investment Co.,* 2013 WL 1222042, at *13-14.
There, the evasive transactions all traced back to borrower and
guarantor surrender agreements (a "BSA" and a "GSA"). The debtor
company executed the BSA two months after the Fund obtained a
withdrawal liability judgment. Both agreements contained a recital
naming the Fund's collection efforts as a motivating factor behind the
insider's declaration of default on the note he held, and that insider
testified that he did not know whether he would have declared the
default if the Fund had not initiated the collection action. *Id.* at
*4, 13-14. Finally, the insider formed a new holding company days
after executing the agreements admittedly for the purpose of holding
the debtor assets surrendered under those agreements because he
"didn't want Central States to get the assets." *Id.* at *5.

The facts in *TAS Investment Co.* provide a clear-cut case of
impermissible evasion under Section 1392(c). Indeed, the insider in
that case admitted his evasive intentions in the agreement recitals
and then again in testimony. Nothing of the sort happened here, where
all of the Fund's evidence of evasive intent is circumstantial. True,
Harris did not draw up documents reflecting the purported debt until
six years after Dizack's first "loan," and this was also around the

time Harris became insolvent. But this could be evidence of Harris, in increased financial distress, paying greater heed to its financial affairs and finally getting some of them in order as much as it could be evidence of evasive purpose. Summary judgment could likely be granted on a Section 1392(c) claim in circumstances less extreme than those in *TAS Investment Co.,* but from the limited facts marshalled here by the Fund, a reasonable jury could find either way. The Fund's Motion for Summary Judgment on Count I is denied.

### C. Improper Distributions (Count II)

In Count II, the Fund again hangs its hat on the debt v. capital contributions argument, saying the Harris transfers were not loans but "improper shareholder distributions in preference to creditors such as the Fund." (R. 48 at 6.) As discussed above, neither party is entitled to a favorable ruling on the character of these transfers as a matter of law. Too many material issues of fact remain. The Fund and Dizack's Motions for Summary Judgment on Count II are denied.

### D. Wisconsin Uniform Fraudulent Transfer Act (Count III)

The Wisconsin Uniform Fraudulent Transfer Act (**"**WUFTA**"**) prohibits fraudulent transfers. The Fund alleges in Count III that the Harris distributions are fraudulent under four of the Act's subsections. (R. 48 at 11 (citing Wis. Stat. Ann. §§ 242.04, 242.05 (West)).) Because some statutory analysis is needed to dispose of the Fund's arguments, the Court now quotes both statutes in full:

## Section 242.04

(1) A transfer made or obligations incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

    (a) With actual intent to hinder, delay or defraud any creditor of the debtor; or

    (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

        1. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

        2. Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Wis. Stat. Ann. § 242.04 (West).

## Section 242.05

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(2) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent.

Wis. Stat. Ann. § 242.05 (West).

Together, these statutes represent four discrete definitions of fraudulent transfer. The Fund contends that the Harris distributions fall within each. First, that argument fails as to § 242.04(1)(b) and

§ 242.05(1). Both of those subsections require a transfer made by a debtor who does not receive a reasonably equivalent value in return. Reasonably equivalent value is exchanged when "property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person." Wis. Stat. § 242.03(1). "Wisconsin cases reveal that the receipt of value must be simultaneous with the transfer." *Seah Chee Wei v. Rocky Point Int'l LLC,* No. 16-CV-1282-JPS, 2017 WL 3916874, at *6 (E.D. Wis. Sept. 6, 2017) (citations omitted). Because of that rule, we are returned yet again to the loan v. capital contribution debate. And, because the WUFTA is a uniform act, the Court may look to cases interpreting other states' versions of the Uniform Fraudulent Transfer Act to determine the meaning of the statute. *Creditor's Comm. of Jumer's Castle Lodge, Inc. v. Jumer,* 472 F.3d 943, 947 (7th Cir. 2007) (citation omitted). "The primary consideration when determining whether an exchange is for reasonably equivalent value is 'the degree to which the transferor's net worth is preserved.'" *S.E.C. v. Helms,* No. A-13-CV-1036 ML, 2015 WL 1040443, at *8 (W.D. Tex. Mar. 10, 2015) (citing *Warfield v. Byron,* 436 F.3d 551, 560 (5th Cir. 2006)). If Dizack loaned Harris money, then upon repayment Harris reaped the value of cutting down its debt. But if Dizack's distributions were actually capital contributions, then Harris did not receive the value simultaneously with Harris's later repayment, nor did Harris erase any debt by paying out. *See, In re*

*Thunderdome Houston Ltd. P'ships,* No. 98 C 4615, 2000 WL 889846, at *7 (Bankr. N.D. Ill. June 23, 2000) (agreeing that capital contributions do not fit within the meaning of debt under the UFTA); *see also, Helms,* 2015 WL 1040443, at *8 ("Capital contributions and other investments alone are generally insufficient to convey reasonably equivalent value."). The Fund's argument for summary judgment is thwarted again by the same beast: Because the Court cannot name the Dizack distributions capital as a matter of law, the Fund cannot show the absence of a reasonably equivalent return of value as required under Sections 242.04(1)(b) and 242.05(1).

The perennial loan v. capital problem also cuts off the Fund's relief under Section 242.05(2). That subsection deems fraudulent any transfer that, among other things, "was made to an insider for an antecedent debt." (*Id.*) What debt? The Fund spilled ink in all three of its filings at bar arguing that Dizack never loaned Harris Lumber a dime. It is bizarre to see the Fund perfunctorily assert that the Harris transfers were undisputedly payback against debt incurred from the Dizack distributions. (R. 48 at 13.) Of course that debt is disputed. The Section 242.05(2) argument fails.

At last, of all the Fund's WUFTA claims, only Section 242.04(1)(a) remains. The issue here is whether Harris, by making its distributions, acted with "actual intent to hinder, delay or defraud" the Fund. *Id.* This is a high bar, requiring "proof of a debtor's intent." *Badger State Bank v. Taylor,* 688 N.W.2d 439, 449 n.25 (Wis. 2004).

Actual intent should be determined within the context of these statutorily enumerated factors (among others):

(a)   The transfer or obligation was to an insider;

(b)   The debtor retained possession or control of the property transferred after the transfer;

(c)   The transfer or the obligation was disclosed or concealed;

(d)   Before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;

(e)   The transfer was of substantially all the debtor's assets;

(f)   The debtor absconded;

(g)   The debtor removed or concealed assets;

(h)   The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(i)   The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(j)   The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(k)   The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Wis. Stat. Ann. § 242.04(2) (West).   Of those factors, only one clearly cuts against Dizack — he was unquestionably a Harris insider as described in factor (a).   A few other factors either weigh lightly against Dizack (meaning toward actual intent) or else weigh toward actual intent with respect to only some of the Harris distributions. For example, factor (i) weighs in favor of actual intent where the debtor is insolvent at the time of transfer.   Under the WUFTA, a

debtor who is generally not paying debts as they become due is presumed to be insolvent. Wis. Stat. Ann. § 242.02. This was undisputedly the case for Harris in at least 2010, so factor (i) weighs against the two Harris distributions after 2010, but not against the seven distributions made pre-2010. Factor (d) provides another example. That factor concerns whether Harris made distributions after having been sued or threatened with suit. Though none of the Harris distributions occurred after the Fund sued in April 2014, many occurred after Harris first learned of the withdrawal liability (thus gaining at least a general awareness of the danger of legal action if Harris triggered and then failed to pay that liability). Regardless, most of the enumerated factors that the Court views as most indicative of fraudulent intent are not present here, *i.e.,* the transfers were not concealed, the debtor did not abscond, and the debtor did not remove or conceal assets. (Wis. Stat. Ann. § 242.04(2)(c), (f), (g)). Beyond this, the Fund adds only that Harris did not receive reasonably equivalent value in exchange for the distributions, but (as described above) the Court cannot say whether that is right. Thus, applying the actual intent factors to Harris's distributions does not present a clear case of actual intent. At least on summary judgment, there are no avenues for relief available to the Fund under the WUFTA. Its Motion for Summary Judgment is denied on Count III.

The Court need not devote much time to Dizack's Motion as to Count III. Dizack argues only that the Harris transfers did not

violate the WUFTA because they were "for the equivalent value of the loans Dizack made to Harris." (Def.'s Mem. in Supp. of Mot., R. 46-1 at 16.) As described above, only two of the four possible WUFTA hooks rely on the "equivalent value in exchange" element. Why Dizack ignored half of the Fund's arguments is a mystery, but it does not matter. As already set forth, whether Harris received equivalent value for its disbursements is tied up in the loan v. capital debate, which the Court cannot resolve on this record as a matter of law. Dizack's Motion for Summary Judgment is denied on Count III.

### E. Withdrawal Liability for Dizack's Leasing Business (Counts IV and V)

To protect the solvency of multiemployer pension plans, the MPPAA contains broad provisions that pierce the usual legal barriers between affiliated but legally distinct businesses. *Central States v. SCOFBP, LLC,* 668 F.3d 873, 876 (7th Cir. 2011). Under one such provision, withdrawal liability will be imposed on an organization when it is (1) under common control with the obligated corporation, and (2) the organization is itself a trade or business. 29 U.S.C. § 1301(b)(1); *Central States v. Fulkerson,* 238 F.3d 891, 894-95 (7th Cir. 2001). That provision's purpose is "to prevent businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities." *Central States v. Messina Prod., LLC,* 706 F.3d 874, 878 (7th Cir. 2013) (citations omitted). No economic nexus is required between the obligated organization and trades or businesses under common control. *Fulkerson,* 238 F.3d at 897 n.1 (citations omitted).

Each trade or business under common control is jointly and severally liable for any withdrawal liability of any other. *SCOFBP, LLC,* 668 F.3d at 876 (citing *McDougall v. Pioneer Ranch Ltd. P'ship,* 494 F.3d 571, 574 (7th Cir. 2007)). And when the trade or business is not incorporated, its owners may be personally liable for the withdrawal liability as well. *See, Central States v. White,* 258 F.3d 636, 645 n.3 (7th Cir. 2001) (noting that non-incorporated businesses offer no shield from personal liability).

Both parties agree that Harris Lumber and Dizack's leasing business were under Dizack's common control. (R. 46-1 at 11; *Central States v. CLP Venture LLC,* 760 F.3d 745, 748 (7th Cir. 2014) (citing 26 C.F.R. §§ 1.414(c)-2(b)(1); 2(c)(1); 2(d)) (noting that under the regulations, two organizations are under common control where five or fewer individuals own a controlling interest and effectively control those organizations).) The inquiry thus turns to whether Dizack's leasing business is a "trade or business" within the meaning of the MPPAA.

Section 1301(b)(1) does not define the phrase "trade or business." To apply the term under the MMPAA, the Seventh Circuit has adopted the test applied in *Commissioner of Internal Revenue v. Groetzinger,* 480 U.S. 23, 35 (1987). *See, Messina,* 706 F.3d at 878 (7th Cir. 2013) (citations omitted). The *Groetzinger* test requires that for economic activity to be considered the operation of a trade or business the activity must be performed (1) for the primary purpose of income or profit and (2) with continuity and regularity. *Messina,*

706 F. 3d at 878. The test also helps distinguish trades or businesses from passive investments, which cannot form the basis for imputing withdrawal liability under section 1301(b)(1). *Id.* at 878-79. Further, the phrase "trade or business" does not "encompass purely 'personal' activities no matter how 'continuous' or 'extended' the activity may be nor how profitable." *White,* 258 F.3d at 642 (citations omitted).

### 1. Whether Dizack's Leasing Operations Constitute a Trade or Business

There are a few different properties at issue here. First, Dizack owned and leased a property in Waukesha, Wisconsin from the late 1990s to 2001. (R. 66 ¶¶ 45-47; R. 67 ¶¶ 14-15.) The record contains precious few facts about this property. Next, Dizack has for years owned and rented property in Racine, Wisconsin. The origin story of that property is a little vague, but this is the Court's reading of the often ambiguous explanations provided by the parties: Dizack purchased a unit in a condo building in Racine; at some point (apparently prior to moving in), Dizack expanded his unit into part of the unit next door. Two units remained, but the sizes of each changed: Dizack's grew, the neighboring unit shrunk. The person who sold Dizack (seemingly both of) these units added as a condition of the sales contract that he — the seller — be allowed to lease the newly shrunk, neighboring unit (the "Racine apartment"). Dizack leased the Racine apartment to the seller and thereafter to other tenants. Dizack cannot simply sell off the shrunken Racine apartment

because to do so would require modifying the existing condominium plat, which the condo association will not allow.

Finally, Dizack purchased a high-rise condo in Naples, Florida in 2004. He began leasing the Naples apartment in 2006 on a series of short term and then annual agreements. From 2006 to 2016, the Naples property had four different tenants. Dizack maintains he initially listed the property for sale, and only turned to leasing when he failed to sell. Dizack then hired a real estate agent who assisted in the management of the Naples apartment by taking photos of the unit for advertisement purposes, handling showings, selecting tenants and drafting the leases, receiving rent checks, ensuring the property was cleaned and supplied, inspecting all furnishing and linens and shopping for replacements when necessary, and forwarding all leases and other paperwork to Dizack for final approval and signature. (R. 66 ¶¶ 56-57.) In 2009 and 2011-2014, Dizack claimed deductions on his tax returns for the cleaning, maintenance, insurance, management fees, repairs, supplies, taxes, utilities, association fees, and depreciation of the Naples property. He claimed deductions for many of the same expenses related to the Racine property in those same years. (R. 66 ¶¶ 72-73.)

The Fund argues these facts are akin to those in *Board of Trustees v. 6516 Ogden Ave., LLC,* 170 F.Supp.3d 1179, 1182-85 (N.D. Ill. 2016), in which the court found leasing operations constituted a "trade or business" where that business leased properties to two entities, collected rent, and claimed business tax deductions. The

Fund ignores, however, that the leasing business in that case was an LLC — a "formally recognized business organization." *Id.* at 1185. That fact steered the court's analysis due to the Seventh Circuit's observation that formally recognized organizations "pose no interpretative difficulties for the *Groetzinger* test." *Id.* (citing *CLP Venture LLC,* 760 F.3d at 749). That is not the case here, where Dizack's *informal* real estate activities generate "thorny questions." *Fulkerson,* 238 F.3d at 895.

Three Seventh Circuit cases — *Fulkerson, White,* and *Personnel* — guide the Court's inquiry among these thorny questions. In *Fulkerson,* the Seventh Circuit reversed the district court's award of summary judgment to the defendants, concluding the trial court erred in finding that the leasing operations constituted a trade or business. Those defendants offered a real estate expert who explained that the unique type of lease at issue demanded almost no time or attention from the defendants and thus resembled a passive investment such as stocks or bonds. *Fulkerson,* 238 F.3d at 894. At a basic level, the *Fulkerson* defendants did too little to be considered in the leasing business. "[T]he mere possession of property over a period of time [does] not establish regular and continuous activity because it [i]s more akin to a 'passive investment.'" *Central States v. Neiman,* 285 F.3d 587, 595 (7th Cir. 2002) (characterizing the holding in *Fulkerson*).

*Central States v. Personnel,* 974 F.2d 789, 796 (7th Cir. 1992) also involves unincorporated real estate activities but in that case

the Seventh Circuit reached the opposite conclusion as in *Fulkerson,*
finding the activities constituted a trade or business.  In contrast
to *Fulkerson,* the *Personnel* defendant "much more frequently engaged in
activities related to leasing, such as buying and selling multiple
properties annually and advertising."  *Fulkerson,* 238 F.3d at 896
(describing *Personnel*).  More specifically, the *Personnel* defendant's
"substantial" real estate business included leasing several properties
(sometimes five in a year) and, at its busiest, buying and selling ten
properties in less than one year.  *Personnel,* 974 F.2d at 795-96.

In *White,* the defendants undertook some rental activities beyond
mere ownership, but the Court found that these activities were "more
akin to purely personal investment, and thus w[ere] not sufficiently
continuous or regular to constitute a trade or business."  *White,* 258
F.3d at 643 (citation omitted).  The leased property in *White* was a
detached garage behind the defendants' house.  Those defendants spoke
to prospective clients and handled routine cleaning and maintenance
problems, organized repairs when necessary, and paid the bills.  *Id.*
The defendants also deducted these costs on their tax returns.  *Id.* at
644.  But the court found that the garage was "an appendage" of the
Whites' property, so their activities amounted to upkeep of their
personal property, which maintained the value of their home and could
not be "easily separated from the normal maintenance and upkeep that
every homeowner performs."  *Id.*

Here, the management and maintenance activities undertaken by
Dizack's real estate agent may be imputed to him for the trade or

business analysis. *See, CLP Venture LLC,* 760 F.3d at 750. All in all, Dizack's leasing activities fall short of those warranting adverse summary judgment in *Personnel,* but they certainly surpass those undertaken by the lease-holding defendants in *Fulkerson,* who did not even maintain the property nor pay taxes on it. *Fulkerson,* 238 F.3d at 893. Dizack tries to excuse his leasing activities by likening both of his properties to the garage in *White,* but the comparison is ultimately unavailing. Dizack starts with a fair argument that his Racine apartment, at least, matches the facts of that case: The Racine apartment is connected to Dizack's primary residence (the two share an interior wall), though it is not truly an "appendage" like the Whites' garage. Further, Dizack cannot sell his own condo without first restoring the Racine apartment to its original dimensions, meaning that any potential sale of his home is tied somewhat to the upkeep of the neighboring unit. *See, White,* 258 F.3d at 643. And though Dizack's business deductions for the Racine apartment may be "strong evidence" of a trade or business, *Personnel,* 974 F.2d at 795, *White* demonstrates that taking such deductions is not conclusive, *see, White,* 258 F.3d at 643, 644-45. But Racine is not the only property Dizack leases, and his Naples condo ruins the *White* analogy. Dizack argues that Naples (while he still owned it) was *also* his home, and so any activities taken in support of that leasehold was also personal investment and upkeep as in *White*. But Dizack admits that in at least four years of his ownership of the Naples condo, it was available for rent every day of the year. He claims he at some

point intended to retire there, but he has not put forth any evidence that he ever actually lived there. Having compared Dizack's leasing activities to the relevant case law, the Court finds that Dizack's operations were regular and continuous activity.

That finding leaves only the question of whether the leasing operations were for the primary purpose of income or profit. *Messina,* 706 F. 3d at 878. This does not pose much of an obstacle for the Fund. Though Dizack describes being required (at least initially) to lease out the Racine apartment as a condition of its purchase, he offers up no such explanation for his repeated leasing of the Naples property. Indeed, he testified that he leased that property "to generate money." (R. 66 ¶ 55.) Dizack tries to clarify that he only meant to "generate money" to cover the costs of keeping the Naples property (such as taxes, condo fees, and utilities) but that is a quibble over semantics. (*Id.*) Whatever the intended purpose of the proceeds, Dizack leased the Naples property with the primary purpose of generating income. The Court cannot as a matter of law draw the same conclusion as to the Racine apartment, but that inability does not change the outcome here. "The rental of real estate is a trade or business if the taxpayer-lessor engages in regular or continuous activity in relation to the property . . . even if the taxpayer rents only a single piece of real estate." *Personnel,* 974 F.2d at 795 (quoting *Alvary v. United States,* 302 F.2d 790, 796 (2d Cir. 1962)). Dizack's leasing operations were entered into with the primary purpose

of generating income, so they constitute a trade or business as a matter of law.

Finally, the Court notes that although Dizack's leasing activities line up with the common law definition of "trade of business," saddling him with ERISA liability may not square with the purpose of Section 1301(b). In *White,* the Seventh Circuit noted that Congress enacted Section 1301(b) "to prevent businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities[.]" *White,* 258 F.3d at 644 (citation omitted). But the Whites' leasing of their garage — which, again, was not a trade or business as a matter of law — had "absolutely no possibility of being used to dissipate or fractionalize" their obligated, corporate assets. *Id.* The Court continued:

> A law with the sound purpose of preventing fractionalization should not be stretched to such an extreme application that would expose a common owner of a completely unrelated personal business to such withdrawal liability. The Whites' two apartments did not offend Congress' purpose designed to prevent businesses from shirking their ERISA obligations. In any event, an owner of a business that is obligated to pay contributions to a common pension fund may need to take extra caution in engaging in real estate and other personal investment activities.

*White,* 258 F.3d at 644. Given the similarities between Dizack's Racine apartment and the Whites' garage and also the open question regarding Dizack's primary purpose in leasing the same, it seems that Dizack's leasing operations (and indeed, Dizack himself) have been hooked for a $1.2M judgment due to a handful of management activities undertaken in Florida. Perhaps the parting note of caution in *White*

reflects the Seventh Circuit's belief that Congress's anti-fractionalization intent behind Section 1301(b) should play an enhanced role in the trade or business analysis. But until the Court of Appeals says to do otherwise, this Court will apply the trade or business analysis as case law dictates even over its concerns regarding how expansive that definition now appears to be.

The Court finds that Dizack's leasing business constituted a trade or business under the *Groetzinger* test and thus the Fund is entitled to summary judgment on Counts IV and V.

### F. Dizack's Motion for Summary Judgment on Statute of Limitations Grounds

In a last reach for summary judgment, Dizack contends that Counts I, II, and III are all time barred by the six-year statute of limitations established in 29 U.S.C. § 1451(c). But a cause of action "does not ripen under the MPPAA until the employer fails to make a payment on the schedule set by the fund." *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of California,* 522 U.S. 192, 195 (1997). That clock began to run in 2014, when Harris missed its first payment. The Fund filed its Complaint in March 2016, well before the clock had run out. Dizack's Motion is denied.

### G. Dizack's Motions to Strike

On two occasions, the Fund's summary judgment briefing offended Dizack. He now moves to strike two of its statements of facts ("SOFs," Rs. 49, 63) complaining that because the Fund included more than one fact per paragraph in its SOFs, the Fund did not comply with

Local Rule 56.1. But that rule does not mandate that parties limit themselves to one fact per paragraph. Rather, Rule 56.1 demands that parties craft SOFs comprising "short numbered paragraphs," and short is a "somewhat subjective term." *Benuzzi v. Bd. of Educ. of City of Chicago,* 647 F.3d 652, 655 (7th Cir. 2011) (considering Local Rule 56.1). The Fund did not get carried away; some of its paragraphs contain multiple facts, but the Court found them to be reasonably well organized. Dizack apparently found the same, for he seems to have had no trouble responding to each of the Fund's statements as contemplated by Rule 56.1. Dizack's Motions to Strike are denied.

## IV.  CONCLUSION

For the reasons stated herein, Dizack's Motion for Summary Judgment (ECF No. 46, 50) is denied. Both of Dizack's Motions to Strike (ECF Nos. 68, 79) are also denied. The Fund's Motion for Summary Judgment (ECF No. 47) is granted as to Counts IV and V and denied as to Counts I, II, and III. The Fund cannot receive any further relief beyond that which it receives now by continuing to litigate Counts I-III. As such, the Court grants the Fund's request (Pl.'s Mot. at 4 n.1, ECF No. 47) for 21 days to establish the amount of damages to which it is entitled.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated:  2/28/18